## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JENIFER VAUGHN | : | |
| | : | |
| Plaintiff, | : | CASE NO. |
| | : | |
| v. | : | TRIAL BY JURY DEMANDED |
| | : | |
| STATE OF DEALAWRE | : | |
| DEPARTMENT OF INSURANCE | : | |
| COMMISSIONER TRINIDAD | : | |
| NAVARRO IN HIS OFFICIAL | : | |
| AND INDIVIDUAL CAPACITIES; | : | |
| MITCHELL CRANE IN HIS | : | |
| INDIVIDUAL CAPACITY; | : | |
| STUART SNYDER IN HIS | : | |
| OFFICIAL AND INDIVIDUAL | : | |
| CAPACITIES; | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

## THE PARTIES

1.     Plaintiff, Jenifer Vaughn ("Plaintiff") was at all times relevant to this complaint a resident of Magnolia, Delaware.

2.     Defendant, State of Delaware Department of Insurance, ("Defendant") is a public corporation organized and existing under the laws of the State of Delaware. Defendant Trinidad Navarro is the current Commissioner of the DOI and, upon information and belief, resides in New Castle County. Defendant Mitchell Crane is the former Deputy Commissioner of the DOI and, upon information and belief,

1

resides in Sussex County. Defendant Stuart Snyder is Trinidad Navarro's Chief of Staff and, upon information and belief, resides in New Castle County.

## JURISDICTION

3.    The jurisdiction of this court is invoked pursuant to the First Amendment of the United States Constitution; Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1983 ("Section 1983"); the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101; and Section 504 of the Rehabilitation Act of 1973 ("Section 504") 29 U.S.C. § 701 *et seq.* As such, the Court has original jurisdiction over this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

## VENUE

4.    The unlawful employment practices alleged herein were committed within the State of Delaware.  Accordingly, venue lies in the United States District Court for the District of Delaware under 42 U.S.C. §1339(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.    Prior to the filing of this action, the plaintiff timely filed a Charges of Discrimination with the Equal Employment Opportunity Commission on or about July 20, 2018 and September 26, 2019 which occurred during her employment with State of Delaware Department of Insurance ("DOI").

6.　　On or about September 21, 2019, the EEOC issued Plaintiff a "Right to Sue Notice" which was received by Plaintiff on or about September 29, 2019.  *EEOC Right to Sue Notice* attached as Exhibit 1.

## FACTS

7.　　Vaughn is a 53-year-old female who was previously the Human Resources Director/Controller with State of Delaware Department of Insurance ("DOI") and has been employed since November 2010.

8.　　By all accounts, Vaughn has been a hardworking and devoted employee with impeccable integrity during her employment with the State of Delaware since March 3, 1996. Vaughn began her career at the Delaware Health and Social Services ("DHSS")/Medicaid as an Administrative Specialist. Next she became an administrative specialist for DHSS for the Vision Impaired and then for the Department of Labor/ Division of Industrial Affairs. She was then promoted to the Office of Management and Budget as a statewide Budget Coordinator. She then moved to DHSS/Division for Adult Mental Health as a Support Services Administrator. Plaintiff performed well and made no complaints regarding her employment prior to Commissioner Navarro's election in November 2016.

9.　　As HR Director and Controller, Vaughn was responsible for all aspects of HR.  She supervised two HR staff members and one support staff member. She was in charge of  hiring new employees, wrote the procedures of

hiring for the department, worked with managers to fill vacancies, wrote interview questions, sat on interview panels, participated in the hiring decision, wrote up proposed hire requests for approval from the Chief of Staff, made the job offer to the selected candidate, negotiated advance starting salaries, wrote salary request justification for state OMB approval. In addition, she wrote department procedures and ensured they were followed on employees' annual performance plans and performance reviews. Specifically, Vaughn was directly responsible to assist management with disciplinary actions, approval of Federal Medical Leave Act (FMLA) requests, short term disability, and American with Disabilities Act (ADA) requests.

10.    Trinidad Navarro was elected in November 2016 as the State of Delaware's 26th Insurance Commissioner.

11.    Upon his election, Navarro was determined to employ past cronies from the New Castle County Sheriff's office and employees he deemed loyal and trustworthy to his election.

12.    Deputy Commissioner Mitch Crane was deemed loyal to Navarro and seen as an asset.

13.    The only female employees trusted by Navarro were those affiliated with Crane.

14. These female employees were commonly referred to as the "Fab Five" or "Mitch's Bitches" by Navarro.

15. The female employees included: Roberta Jones, Kia Turner, and Tina Miller, Julia Moore, and Jennifer Stinson.

16. All other female DOI employees including Vaughn were viewed with suspicion.

17. Navarro brought his longtime friend and colleague, Stuart Snyder, to serve as his Chief of Staff.

18. Within two weeks of taking office, Navarro began taking some disturbing actions.

19. Immediately after being elected, Navarro requested Mitchell Crane, Deputy Commissioner, approach Vaughn, and ask for a list of anyone who was within one year of hire at the DOI.

20. All individuals who are within one year of hire in a department are considered "on probation" and can be terminated more easily than employees who have reached one year of employment with a department.

21. Vaughn gave Crane a list of five to ten individuals who were within the one-year cut-off, but Crane inquired further only about African American female manager Fleur Mckendell ("McKendell").

22.     Crane asked Vaughn whether McKendell had any disciplinary violations or whether there was any other basis upon which she could be terminated.

23.     Deputy Commissioner Crane did not ask these questions about anyone else on the list, all of whom were white/Caucasian.

24.     Vaughn was extremely concerned that the heightened scrutiny of McKendell was due to the fact that McKendell is an African American woman.

25.     During Vaughn's tenure as Director of Human Resources at DOI, neither Deputy Commissioner Crane nor any other person associated with Commissioner Navarro's administration asked Vaughn for the personnel files of any other DOI employee.

26.     Around that same time, McKendell approached Vaughn with a complaint of racial/ sexual harassment about Navarro and Crane. She complained that Crane and Navarro would touch her hair, braids, and clothes. Deputy Commissioner Crane also commented on Ms. McKendell's appearance, asking her questions about why she was 'all dressed up.' During the same interaction, as McKendell walked away, Crane grabbed McKendell's hand and said, "let me see those nails" and commented that her nails were "interesting."  Crane also made numerous other comments about McKendell's clothing and shoes of a type that he did not direct to other non-African American employees.

27.     At the time McKendell did not want to formally complain about it but informed Vaughn that the actions made her uncomfortable.

28.     Vaughn promised to speak to Navarro and Crane about their behavior but McKendell didn't want to take any action at that time.

29.     An anonymous letter was sent to Navarro asking the Commissioner to be careful of Mitch Crane because of his prior actions with the past administration.

30.     Navarro wanted to get to the bottom of who wrote the letter and called an executive meeting to find the culprit.

31.     Navarro was unconcerned about the actual contents/substance of the letter.

32.     Navarro's team immediately targeted Mckendell.

33.     Without notice to Vaughn, McKendell was interrogated in the Sussex Conference room by Snyder and Navarro using handwriting samples of documents which were taken from her office.

34.     Upon being notified of the interrogation, Vaughn asked Snyder why she was not notified as the HR Director.

35.     Snyder simply replied, "I don't really know".

36.     Vaughn informed Snyder that Labor Relations should have been engaged before meeting and/or questioning any employee.

37.     Snyder unequivocally told Vaughn to stay out of the matter and he was handling the matter.

38.     From that point on, Vaughn was left out of all discussion regarding McKendell.

39.     Immediately afterward, Vaughn received a grievance alleging discrimination, retaliation, and a hostile work environment via email by McKendell against the DOI's executive leadership including Navarro and Deputy Commissioner Mitchell Crane.

40.      Stuart Snyder ("Snyder") and Director Frank Pyle ("Pyle") were copied on the email.

41.     McKendell's grievance specifically complained about the actions of  DOI employees Trinidad Navarro, Mitch Crane, Stuart Snyder and Jessica Willey.

42.     Vaughn sought the assistance of Amy Boner from the State's Human Resources office who recommended she begin an administrative investigation.

43.     Upon receipt of the grievance, Navarro stood in the doorway of Vaughn's office demanding she give him a copy of the grievance.

44.     Navarro refused to leave her office until he received a copy of the grievance.

45.     Vaughn told Navarro she would need to seek advice from Amy Boner of the State Human Resources Department to see whether he could receive the grievance.

46.     While blocking her door, Navarro informed Vaughn that he was the head of the department and could review any record he wants.

47.     Navarro refused to let Vaughn leave her office until she provided the grievance.

48.     Navarro specifically said if she wanted to leave she would give him what he requested.

49.     Vaughn felt threatened and the only way she could leave was to provide the document.

50.     Vaughn was unable to conduct the investigation into the grievance because (1) a family medical emergency and (2) Navarro requesting she be removed from the investigation due to her not having blind loyalty to Navarro.

51.     Vaughn objected to Deputy Attorney General Jessica Willey[1]'s inclusion and involvement in the grievance process since she was a named actor in the grievance.

52.     Prior to the issues with McKendell, Willey was largely uninvolved in labor/personnel issues.

---

[1] Willey was the DAG assigned to the DOI.

53.    On January 22, 2018, Snyder advised Vaughn that Jessica Willey be involved in all communications regarding the grievance.

54.    Similarly, McKendell questioned Snyder's involvement, calling it a "conflict of interest".

55.    On January 31, 2018, Snyder demanded that Vaughn not be involved in any HR matters relating to McKendell's grievance and that all communication go through himself or counsel.

56.    Snyder advised Vaughn to provide documentation to Willey regarding the grievance and that if she did not do so, she would be subject to disciplinary action.

57.    Vaughn followed instructions and confirmed to Snyder that she provided the grievance documents to Willey.

58.    The State's HR department completed the investigation and found Navarro's staff conducted themselves improperly and suggested several action steps going forward (which were never completed).

59.    On February 7, 2018, in a different HR matter, Snyder instructed Vaughn to remove documents from an employee's personnel file.

60.    Vaughn objected to removing confidential documents from an employee's personnel file, but acknowledged that if Snyder insisted, she would have to do so.

61.     On February 9, 2018, Snyder demanded Vaughn remove the documents from the employee's personnel file.

62.     Vaughn confirmed via email that she removed the documents.

63.     On or around June 2017, at the first Director's meeting held after Navarro took office, the Commissioner went around the table and asked if anyone had something to add.

64.     When Navarro got to Vaughn, she said nothing. Navarro then went on a rant against her not being allowed to email the executive staff members any longer. No other director was targeted by Navarro.

65.      Vaughn had previously emailed Crane about concerns she had regarding his travel schedule regarding accumulating travel points when travelling on business for personal trips. Navarro instructed Vaughn that  under no circumstances was she allowed to email executive staff  because the communications were subject to FOIA and could become public.

66.     Vaughn told Navarro that she could not and would not follow his directive.

67.     Vaughn was humiliated, bullied, and targeted by Navarro in front of the entire executive staff.

68.      Vaughn complained to Snyder about the incident but was summarily dismissed.

## McKendell's Prior FMLA and ADA Requests

69.    Vaughn had processed McKendell's FMLA requests (sent originally by her lawyer and then her doctor), and prior Americans with Disabilities Act reasonable accommodation request to work from home (an alternative work location).

70.    For all these issues, Vaughn worked with and sought the advice from experts within state government.

71.    Abruptly, Vaughn was informed by Navarro and Snyder that she did not have the authority or the right to approve such requests regarding McKendell.

72.    Vaughn had previously handled identical requests already for numerous other employees during her time as HR Director. It was a normal part of her job.

73.    Vaughn was emailed by Snyder and told that anything related to the McKendell case was to be passed on to him immediately and she was not to respond because of the possibility of litigation.

## SPRING 2017

74.    In May 2017, Vaughn was called into the Commissioner's office to discuss McKendell's grievance.

75.    Upon walking into the office, Navarro was accompanied by, Jessica Willey, DAG for the DOI.

76.    Upon sitting down, Navarro said he wanted to ask Vaughn a question and she needed to think really hard about her answer.

77.    Navarro asked Vaughn, "What side are you on Was she on his side or Fleur's side?"

78.    Vaughn was shocked by the question and that DAG Willey had no issue with Navarro asking it.

79.    After being shocked, Vaughn stated she was not taking sides only trying to do the right thing.

80.    Vaughn was excused from the meeting immediately and was barred to participate in any other conversations regarding McKendell.

81.    Navarro made it clear that if you failed to show blind loyalty to him you would be targeted as an enemy.

82.    In addition, he had the support of Willey in this view.

83.    At one point, Vaughn scheduled a lunch with a former DOI Chief of Staff, McKendell and another DOI director Frank Pyle.

84.    The lunch was purely a social occasion.

85.    At the last minute, Pyle cancelled.

86.     After lunch, Snyder warned Vaughn that having lunch with McKendell could be a liability to herself and the department.

87.     DOI DAG Willey instructed Snyder that he could not tell Vaughn who she could go to lunch with but he then leaned into Vaughn and told her that she needs to think more before she goes out to lunch with McKendell.

88.     On January 2, 2018, Vaughn was called into the Chief of Staff Snyder's office.

89.     Snyder informed Vaughn he wanted to discuss her role as HR Director.

90.     Snyder was accompanied by DAG Kathleen Makowski.

91.     Snyder informed Vaughn that the roles of HR Director and the Controller position were going to be divided into two individual positions.

92.     Snyder claimed he wanted the HR Director to take on more tasks and Vaughn was not able to do all he wanted done in her current position.

93.     The tasks he explained the HR Director would be doing was exactly what Vaughn was already doing (HR Director's duties have not changed at all to present).

94.     Apparently, Snyder and one of the department's attorneys had been working without her knowledge with the State's HR department on breaking the position apart and reclassifying the positions. Normally, Vaughn would have been

14

involved in the process.

95.     Snyder told Vaughn she could not do both the positions well.

96.     Snyder informed Vaughn they were about to post the new position and she was welcome to apply for the new position.

97.     However, the new position was a downgraded paygrade and Vaughn was already paygrade 18.

98.     Snyder and the rest of the Navarro team knew full well that Vaughn could not take a pay cut because she just purchased a new home.

99.     Snyder's comments were nonsensical since they were currently prohibiting Vaughn from completing her tasks as HR Director.

100.    The changing of the position was solely intended to hurt Vaughn in retaliation for her actions related to McKendell.

101.    Even though Vaughn was still HR Director until they hired a new individual, Vaughn was shunned by the office and prohibited from doing any human resources work.

102.    Eventually Navarro hired a former employee from his old Sheriff's office to ensure his bidding would be done.

103.    On January 9, 2018, Vaughn moved forward on filing a Charge of Discrimination against the DOI with the EEOC alleging retaliation against her in regard to McKendell's grievance and complaints against DOI.

104.   After filing the Charge of Discrimination, Navarro's team continued to discriminate against McKendell and retaliate against Vaughn.

105.   On several occasions when Vaughn was absent from the office, Navarro gained access to McKendell's personnel file.

106.   On one occasion, Snyder accused Vaughn of hiding McKendell's file.

107.   However, McKendell's file was on Vaughn's desk because her reasonable accommodation requests and other issues were still current.

108.   Snyder demanded McKendell's file.

109.   Vaughn informed Snyder that it was not proper since he was named in the grievance.

110.   Vaughn turned over the file in protest after Snyder threatened her with disciplinary action up to and including dismissal if she didn't.

111.   In April 2018, Snyder accused Vaughn of meeting McKendell in the back stairwell and providing her department papers to assist with her grievance hearing.

112.   Vaughn did not provide McKendell anything except an empty box which she asked for – as their offices were both located next to the stairwell.

113.   In July 2019, Vaughn was invited to an audit meeting from the state auditor's office.

114.   The meeting title was "Fraud" and the entire executive staff was

invited.

115.   At the last minute, Snyder told Vaughn she was not to attend this meeting.

116.    After the meeting, Snyder instructed Vaughn that if she received any requests for information from the auditor's office, she was not to respond and to forward him the request immediately.

117.   Snyder's request was a complete deviation from standard operating procedure.

118.   Vaughn had previously worked every year closely with any auditor that came into the department without interference.

119.   This is particularly important for the DOI since they accumulate their own funds and were audited every year.

120.   On Tuesday, August 13, 2019 around 8:15 am Vaughn went to Snyder's office looking to retrieve a document that she asked him to sign but never got back.

121.    Snyder told Vaughn that he had some issues with the document but did not have time to talk about it.

122.   Snyder then proceeded to ask Vaughn when Alice Cabana was due to be in at work.

123.    Vaughn told Snyder that she would be in approximately 8:30 am.

124.    Snyder told Vaughn he would call her back to his office maybe around 9:00 am.

125.    Snyder found Alice Cabana, the employee he was looking for, shortly after she spoke with him.

126.    Within minutes, Vaughn received a phone call from Snyder summoning her to his office.

127.    Snyder informed Vaughn that for the previous four (4) weeks he had been investigating Vaughn regarding sharing her password with Alice Cabana (DOI employee for over 15 years) to a State specific financial computer program that all departments use to pay bills.

128.    Snyder gave Vaughn no specifics such as dates or transactions - just that Vaughn's access to that system was being suspended and Vaughn was to leave immediately (her key badge was deactivated).

129.    Snyder informed Vaughn that he would let her know when the investigation was over and she could come back to work.

130.    Vaughn and Cabana were both escorted out.

131.    Snyder claimed access to program was an essential core function of their jobs – although it is not.

132.    In addition, Snyder locked Vaughn out of her state email.

133.    Since Vaughn's suspension, Snyder has been contacting previous

subordinates of Vaughn (who have left the department) to "dig up dirt" on her asking if Vaughn had ever shared her password with them and if there was anything else they could share with him that she did wrong as a Controller. Some of the employees called by Snyder hadn't been employed in over a decade.

134.   It is clear Navarro, Crane, and Snyder are trying to concoct reasons to terminate Vaughn in retaliation for her trying to conduct investigations properly and without bias regarding McKendell.

135.   On September 6, 2019, the Chief of Staff sent both Vaughn and Cabana a letter stating that the matter is still actively under investigation.

136.   As a result of Navarro's bogus investigation, Vaughn is unable to obtain employment with other state agencies.

## COUNT I - RETALIATION

### (First Amendment/Section 1983)
### (DOI, Trinidad Navarro, Stuart Snyder, Mitchell Crane in their official and individual capacities)

137.   Plaintiff re-alleges and adopts the allegations of paragraphs 1-136 above as if fully set forth herein.

138.   Plaintiff engaged in the protected activity of investigating McKendell's claims of discrimination and harassment. *Vega v. Hempstead Union Free School District*, et al., No. 14-2265 (2d Cir. Sept. 2, 2015)

139.   Plaintiff engaged in the protected activity of processing

McKendell's FMLA and ADA requests.

140.    Plaintiff's actions were not disruptive to the DOI.

141.    Plaintiff was retaliated against by the State of Delaware and State actors acting under color of law for exercising her protected activity of participating in investigations of discrimination.

142.    Plaintiff was retaliated against by the State of Delaware and State actors acting under color of law for exercising her protected activity of processing legitimate FMLA and ADA requests.

143.    Defendants were aware of Plaintiff's protected activity, and were motivated, in whole or in part, to retaliate against Plaintiff because of the protected activity.

144.    Commissioner Trinidad Navarro , Deputy Commissioner Mitchell crane, and Chief of Staff Stuart Snyder were directly involved in the decision to retaliate against Plaintiff for her protected activities, Moreover, Commissioner Navarro, Commissioner Crane, and Chief of Staff Snyder have chosen to direct continued hostility and heightened scrutiny toward Plaintiff in the subsequent months, and have sought to isolate, ostracize, and undermine Plaintiff, as well as to deny her opportunities for growth and advancement.

145.    The conduct of Commissioner Trinidad Navarro, Mitchell Crane and Chief of Staff Stuart  Snyder  violated  Plaintiff's  clearly  established  constitutional

rights, of which a reasonable person would have known.

146.    The conduct in which Defendants engaged would deter a reasonable person from engaging in lawful protected activities.

147.    Plaintiff's request for relief as to the DOI in this Count is limited to prospective injunctive relief, as she requests the reinstatement of her employment, and requests for prospective training and analysis with the goal of addressing discrimination and retaliation.

## COUNT I-SEX DISCRIMINATION/SEXUAL HARASSMENT

148.    Plaintiff hereby incorporates by reference all previous paragraphs as though set forth in full herein.

149.    Such acts as described above by defendants, its agents and employees, constitute unlawful sex discrimination and sexual harassment against Vaughn in violation of Title VII, 42 U.S.C. §2000(6), et seq.

150.    As a direct and proximate result of Defendants' unlawful discrimination, in the nature of sexual harassment, by and through its agents and employees, Vaughn has been injured and has suffered and will continue to suffer pain, humiliation, anxiety, depression, mental anguish, emotional distress, physical manifestation of anxiety and the loss of past and future wages and benefits.

## COUNT II- RETALIATION

151.    Plaintiff hereby incorporates by reference all previous paragraphs as

though set forth in full herein.

152.    Such acts as described above by Defendant, State of Delaware, Department of Insurance its agents and employees constitute unlawful retaliation against Plaintiff for participating in the processing and investigations of McKendell's ADA requests, FMLA requests, and grievances against Navarro, Crane, Snyder, and Willey.

153.    As a direct and proximate result of Defendant's unlawful retaliation, by and through its agents and employees, Plaintiff, Jenifer S. Vaughn, has been injured and has suffered and will continue to suffer pain, fear, humiliation, anxiety, depression, mental anguish, emotional distress, physical manifestation of anxiety and lost wages and lost benefits.

**WHEREFORE**, Plaintiff requests this Honorable Court enter a judgment in his favor and against the Defendants as follows:

a.    Declare the conduct engaged in by the defendant to be in violation of the plaintiff's statutory rights.

b.    Order the rehiring of the plaintiff at a level which is commensurate with her time and experience previously held by the plaintiff, or in lieu thereof granting the plaintiff front pay to compensate him for pecuniary losses he will suffer as a result of defendant's wrongful conduct.

c.    Award the plaintiff back pay compensation for her pecuniary losses from the date of the wrongful conduct described herein until the date of any judgment.

d.    Award the plaintiff sufficient funds to compensate her for her losses, pain and mental suffering, which cannot otherwise be compensated by equitable relief.

e.    Award the plaintiff compensatory such as front pay and punitive damages not otherwise specified.

f.    Award the plaintiff any and all other liquidated damages, which would make the plaintiff "whole".

g.    Award the plaintiff attorney fees, the costs of this action, pre-judgment and post judgment interest, and

h.    Such other and further relief as this Court deems just and proper.

**THE POLIQUIN FIRM, LLC**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esq.
DE Bar I.D. No. 4447
155 S. Bradford St., Ste. 203
Dover, DE 19904
(302) 702-5500
*Attorney for Plaintiff Jenifer Vaughn*

Dated: December 20, 2019

23